Vincent **ALLEN**, Plaintiff,

v.

Elliot **RICHARDSON**, Secretary of the United States Department of Health, Education and Welfare, Defendant.

Civ. A. No. 39125.

United States District Court,
E. D. Michigan, S. D.

Oct. 29, 1973.

---

Sally W. Stabler and Jeanne F. Franklin, Michigan Legal Services, Detroit, Mich., for plaintiff.

Ralph B. Guy, Jr., U. S. Atty. by Nancy J. Ezis, Asst. U. S. Atty., Detroit, Mich., for defendant.

## AMENDED MEMORANDUM OPINION AND ORDER

KEITH, District Judge.

This is a suit brought before this Court under 42 U.S.C. §§ 405(g) and 1395ff for review of a final decision of the Secretary of Health, Education and Welfare (hereinafter referred to as the "Secretary") that denied certain benefits to plaintiff under Part A of Title XVIII of the Social Security Act (Medicare), which creates hospital and post-hospital health benefits for persons over 65. 42 U.S.C. § 1395c.

The facts of this case as determined by the Court file and the record of the administrative proceedings, disclose that plaintiff, Vincent Allen, who was then 70 years old, was hospitalized for five days at Jennings Memorial Hospital in August 1970, with a diagnosis of cancer of the bladder, chronic brain syndrome and advanced pulmonary emphysema.

While plaintiff was at the hospital surgery was performed on his bladder.

On August 25, 1970, plaintiff was transferred to the Moroun Nursing Home for continuing treatment of the same conditions. Except for the period between November 18, and November 21, 1970, when plaintiff was returned to the hospital for various tests, plaintiff stayed at the nursing home until December 5, 1970. Specifically, plaintiff, who was transferred to the nursing home while his prognosis was "guarded," received observation by the medical staff of his post-operative condition, as well as the type of care that was needed to meet his personal needs of daily living (i. e. assistance with eating, bathing, dressing, toileting, getting in or out of bed, moving about, taking medications, and changing simple dressings. See the Secretary's Transcript of Proceedings Relating to the Claim of Vincent Allen, at 56. (hereinafter cited as "Tr.")

Plaintiff expected to receive Medicare payments for the cost of his care at the nursing home because plaintiff's physicians· certified and periodically recertified in September, October and November of 1970, that plaintiff continued to need skilled nursing care in the nursing home for the conditions for which he had been hospitalized; because plaintiff received no notice contradicting the certifications of his physicians or warning that Medicare would stop paying for the care he had been receiving since his hospitalization; and because Medicare's fiscal intermediary (Blue Cross) gave preliminary approval of Medicare coverage based on plaintiff's diagnosis.

On November 13, 1970, an initial decision was made that denied coverage for the cost of the extended care services that plaintiff received at Moroun Nursing Home, and plaintiff was notified for the first time, that his expenses were not covered.[1] On December 7, 1970, plaintiff requested a reconsideration of that determination, and on March 26, 1971, a reconsideration determination was made that affirmed the original decision. On April 9, 1971, plaintiff requested a hearing, and a hearing was held on October 7, 1971.[2]

On October 29, 1971, the Administrative Law Judge (hearing examiner) rendered a decision that held that the services plaintiff received at Moroun Nursing Home were custodial and supportive; that the services did not represent skilled nursing care, and that such services must be excluded from coverage under Medicare. On June 30, 1972, plaintiff requested Appeals Council review, and on August 28, 1972, the Appeals Council issued notice to plaintiff that the Administrative Law Judge's decision was correct and that it would be recognized as a final decision of the Secretary. Plaintiff at this time was notified of his right to judicial review pursuant to Section 205(g) of the Act, 42 U.S.C. § 405(g).

In the present action plaintiff seeks to reverse the Secretary's decision (by way of a Motion for Summary Judgment) by contending that because plaintiff was not afforded an opportunity for adequate notice and hearing before his benefits were denied, plaintiff's Medicare benefits were retroactively "terminated" by procedurally defective and unconstitutional procedures;[3] and that plaintiff

---

1. Plaintiff subsequently paid a bill of $1,994.-03 for the care that he received at the Nursing Home out of his savings which was substantially depleted. (Tr. at 58.)

2. Plaintiff was not present at the hearing, however, he was represented by Mr. Roger R. Andrews, President of the Detroit Metropolitan Counsel of Senior Citizens. Mr. Andrews who was also the prime witness, stated that he [like Mr. Allen] was a retired person from the Chrysler Corporation, that he knew plaintiff for 15 or 20 years, and that he was aware of the nature of plaintiff's illness. Mr. Andrews was assisted at the hearing by Mr. David Brindle, a research assistant to the Social Security Department of the United Automobile, Aerospace and Agricultural Implement Workers of America.

3. The Court will not address this issue because plaintiff is the only plaintiff in this case, and he has already received a hearing

required and received skilled nursing care within the meaning of the Act.

In opposition to plaintiff's claims, defendant contends that plaintiff's Motion for Summary Judgment should be dismissed because the order of the Secretary which denied Medicare payments to plaintiff was based on findings which are supported by substantial evidence; and that no benefits under Title XVIII of the Social Security Act were "terminated."

■ This Court has jurisdiction over this case under 42 U.S.C. § 405(g), as amended, which provides for federal District Court review of final decisions of the Secretary. The statute, however, limits the scope of review to consideration of the pleadings and the transcript of the administrative record and thus precludes de novo review. Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1972).

■ The statute also states that the standard of review is whether the Court finds in the record substantial evidence to support the Secretary's decision.[4] The Court, however, is duty bound to give careful scrutiny to the entire record to assure that there is a sound foundation for the Secretary's findings, and that his decision is rational. If raised in the pleadings, such a review also includes review of the lawfulness of the procedures and standards employed by the Secretary in reaching a decision. Pippin v. Richardson, 349 F.Supp. 1365 (M.D.Fla.1972); Reading v. Richardson, 339 F.Supp. 295, 300 (E.D.Mo.1972).

Regarding plaintiff's contention that plaintiff required and received skilled nursing care within the meaning of the Act, and not custodial care, the Court notices that the Act precludes compensation for expenses where such expenses are for custodial care, 42 U.S.C. §

1395y(a)(9), but that the act does not define specifically what constitutes custodial care. The Regulations of the Social Security Administration, however, do provide some guidelines.[5] Section 405.126, of the Regulations, 20 C.F.R. 405.126 states that:

> Posthospital extended care is that level of care provided after a period of intensive hospital care to a patient who continues to require skilled nursing services (as defined in § 405.127) on a continuing basis * * * but who no longer requires the constant availability of medical services provided by a hospital.

Section 405.127 of the Regulations, 20 C.F.R. 405.127, provides in relevant part that:

> (a) *Defined.* A skilled nursing service is one which must be furnished by or under direct supervision of a licensed nursing personnel and under the general direction of a physician in order to assure the safety of the patient and achieve the medically desired result. Skilled nursing includes
>
> (1) Observation and assessment of the total needs of the patient.
>
> (2) Planning and management of a treatment plan; and
>
> (3) Rendering direct services to the patient.
>
> *     *     *     *     *
>
> (c) *Evaluation of services as skilled or unskilled.*
>
> In evaluating whether services not enumerated in paragraph (b) of this section are skilled or unskilled nursing services, the following principles shall be applied;
>
> (1) The classification of a particular service as either skilled or unskilled is based on the technical

---

on his claim; and because this issue involves a constitutional question which is not dispositive of this case.

4. Substantial evidence has been defined as "such relevant evidence as a reasonable mind would accept as adequate to support a con-

clusion." *Perales, supra* at 401, 91 S.Ct. at 1427.

5. It must be noted that these regulations were published on June 4, 1971, a date which is after plaintiff was notified that he was entitled to no benefits.

or professional training required to effectively perform or supervise the service. For example a patient, following instructions, can normally take a daily vitamin pill. Consequently, the act of giving the vitamin pill to the patient because he is too senile to take it himself would not be a skilled service. Similarly, State law may require medication only from a licensed nurse. This fact would not make administration of a medication a skilled nursing service if such medication can be prescribed for administration at home without the presence of a skilled nurse.

(2) The importance of a particular service to an individual patient does not necessarily make it a skilled service. For example, a primary need of a nonambulatory patient may be frequent changes of position in order to avoid development of decubiti. Since changing of position can ordinarily be accomplished by unlicensed personnel, it would not be a skilled service.

\* \* \* \* \* \*

(4) Any generally nonskilled service could, because of special medical complications, require skilled performance, supervision, or observation. In such cases, the complications and special services involved must be documented by physician orders and or nursing notes. For example, the existence of a plaster cast on an extremity would not generally indicate a need for skilled care, however, a preexisting acute skin problem and a need for special traction of the injured extremity might require skilled personnel in order to properly observe for complications and adjust traction accordingly. Such procedures would be undertaken only on specific physician order and would be documented in nursing reports.

The possibility of adverse effects from improper performance of an otherwise unskilled service does not make it a skilled service.

\* \* \* \* \* \*

Recent federal cases involving Medicare appeals have held that:

The Medicare Act which creates health insurance for the aged is remedial and therefore to be construed liberally to effectuate the congressional purpose of insuring that adequate medical care is available to the aged throughout this country. Pippin v. Richardson, *supra* 349 F.Supp. at 1369; Reading v. Richardson, *supra*.

Accordingly several cases, such as this one, which involved treatment received before the federal regulations were enacted reversed the Secretary's decisions saying that a sensible non-technical approach was called for:

It was never intended by Congress that condition of the insured, treatment that might at any time be necessary, and the pain and discomfort attending inadequate or unprofessional care or lack of care not be considered together with treatment actually provided in determining whether extended care services are justified. Every aspect of the plaintiff's physical condition must be considered in making the determination. Sowell v. Richardson, 319 F.Supp. 689, 692 (D.S.C. 1970); See also, Ridgely v. Secretary of Health, Education and Welfare, 345 F.Supp. 983 (D.Md.1972), affirmed, 475 F.2d 1222 (4th Cir. 1973); and Reading v. Richardson, *supra*.

In the *Pippin* case, the above quoted principle was followed although the federal regulations did apply to that case. The court there held that the regulations are too restrictive in their interpretation of "skilled care" and that the patient's total needs must be considered. Moreover, several courts have refused to accept the broad view taken by HEW of the "custodial care" exception. For example in Harris v. Richardson, 357 F. Supp. 242 (E.D.Va.1973), Judge Mer-

hige rejected HEW's broad view and quoted from Ridgely v. Secretary of Health, Education and Welfare, *supra* 345 F.Supp. at 993, by stating that:

> Indeed, it appears to this Court that the purpose of the Custodial care disqualification in § 1395y(a)(9) was not to disentitle old, chronically ill and basically helpless, bewildered and confused people like Mrs. Hape from the broad remedy which Congress intended to provide for our senior citizens. Rather, the provision was intended to stop cold-blooded and thoughtless relatives from relegating an oldster who could care for him or herself to the care of an ECF [extended care facility] merely so that the oldster would have a place to eat, sleep, or watch television. But when a person is sick, especially a helpless old person, and when those who love that person are not skilled enough to take care of that person, Congress has provided a remedy in the Medicare Act, and that remedy should not be eclipsed by an application of the law and findings of fact which are blinded by bureaucratic economics to the purpose of Congress.

The substance of the above quotation was also recently adopted by Judge Feikens in Pantano v. Richardson, No. 38873 (E.D.Mich., July 11, 1973). In the *Pantano* case, plaintiff, Mrs. Pantano, who was 77 years old, underwent surgery for a hip fracture. During the surgery, a Jewett nail was inserted in the bone to secure the fracture. After the surgery Mrs. Pantano was transferred to a nursing home pursuant to the directions of her doctor, A. Joseph Hoski. Later, plaintiff's attending doctor, D. Iacobelli, executed a certification form certifying that the services of an extended care facility were "medically necessary" because of the need for physical therapy. Nearly two months later, on April 8, 1970, Mrs. Pantano was discharged from this facility. The hearing examiner denied plaintiff's claim for reimbursement of the expenses incurred at the nursing home on the grounds that Mrs. Pantano had received "custodial care."

In reversing the findings of the Secretary, Judge Feikens ruled that the view of extended care services that was taken by the Secretary was to analyze the actual care that was rendered to Mrs. Pantano; that this view was narrower than that intended by Congress and not supported by the weight of authority and reason;[6] that the view that the Social Security Act is remedial in nature and is to be construed liberally, is the view that is consonant with that of the Court of Appeals for the Sixth Circuit, See Walston v. Gardner, 381 F. 2d 580 (6th Cir. 1867); and that under this authority "the court is constrained to hold that the Secretary applied the wrong legal standards and that his decision is therefore not supported by substantial evidence."

In light of the record of this case, this Court also rules that the Secretary applied the wrong legal standards and that his decision is not supported by substantial evidence. In reaching this conclusion the Court considered the following:

1. Plaintiff's prognosis at the time of his transfer from Jennings Memorial Hospital to Moroun Nursing Home on August 25, 1970, was "Guarded."

2. The record upon which the hearing examiner based his decision contains a copy of a letter dated November 19, 1970, from Dr. Eugene C. Anderson, a board-certified urologist which states that:

> Mr. Allen suffers from Transitional Cell Carcinoma of the Urinary Blad-

---

6. Judge Feikens cited Sowell v. Richardson, *supra*; Reading v. Richardson, *supra*; Bremer v. Richardson, 347 F.Supp. 465 (D.Neb. 1972); Ridgely v. Secretary, *supra*; Pippen v. Richardson, *supra*; and Lord v. Richardson, 356 F.Supp. 232 (S.D.Ind.1972); but also noted there are cases to the contrary. See e. g. Mutzig v. Richardson, 348 F.Supp. 526 (E.D.Pa.1972); Johnson v. Richardson, 336 F.Supp. 390 (D.C.Pa.1971); and Weir v. Richardson, 343 F.Supp. 253 (S.D.Ia. 1972).

der, Chronic Brain Syndrome with Seizures, and Pulmonary Emphysema. The prognosis is guarded.

In our opinion Mr. Allen requires continuous supervision of a professional nurse on a 24 hour basis. (See Tr. at 55.)

3. Physicians that directly treated plaintiff, certified pursuant to statute, 42 U.S.C. § 1395f(a)(2), on four separate occasions, that plaintiff needed post-hospital skilled nursing services for the conditions for which plaintiff was hospitalized. The justifications given for the certifications were that plaintiff required skilled post-operative care of his bladder, and skilled nursing care for plaintiff's marked confusion that resulted from an old brain injury and for polyuria and some dysuria. (Tr. at 61.)

4. The medical advisor, Dr. John Sigler, (a board-certified internist) who testified that the treatment that plaintiff received at the nursing home was custodial care and not skilled care did not examine the plaintiff, made his evaluation approximately 12 months after plaintiff was under treatment, and was recognized by the hearing examiner as having no personal knowledge of plaintiff's condition. (Tr. at 26, 37.)

5. Federal district courts in similar Medicare appeals have given great weight to physician certifications of the appellant's medical needs and have reversed or modified the Secretary's decisions accordingly. [See] Ridgely v. Richardson, *supra*; Pippin v. Richardson, *supra*.

From the administrative transcript it appears evident that the Secretary based his denial of benefits on the fact that many of the services that plaintiff received at the nursing home were of a routine or "custodial" nature, (Tr. at 8, 9, 22, 23, 56, 64 and 68), however, when the transcript is viewed as a whole it is apparent that plaintiff also required "skilled" nursing care to observe his total "guarded" condition; that is, the level of care that plaintiff required was higher than the custodial or supportive level.

It is the opinion of this Court that when the Secretary focused primarily on the fact that plaintiff was ambulatory, required only oral medications, did not need a special diet, and received the type of care that assisted plaintiff to meet his personal needs of daily living, (Tr. at 8, 9, 56, 64, and 68) the Secretary was analyzing the actual physical care and not the total care that was rendered to Mr. Allen, thus employing an approach that was narrower than that intended by Congress and not consonant with the view of the Sixth Circuit that the Social Security Act is remedial in nature and is to be construed liberally. See Pantano v. Richardson, *supra*.

In view of the above, the Court rules that the level of care that plaintiff received during his stay at the Moroun Nursing Home was of the type that qualified him for reimbursement under Medicare, and that the Secretary's decision that denied Medicare extended care benefits to plaintiff must be reversed.

It is so ordered.