Richard G. HREBEC et al.,
Plaintiffs–Appellants,

v.

AETNA LIFE INSURANCE CO.,
Defendant–Respondent.

No. 41156.

Missouri Court of Appeals,
Eastern District,
Division Two.

July 15, 1980.

W. Scott Pollard, Florissant, for plaintiffs–appellants.

Hiram W. Watkins, Sullivan & Watkins, Clayton, for defendant–respondent.

GUNN, Presiding Judge:

This appeal arises from a suit to determine coverage and enforce payment under a medical insurance plan. Plaintiffs–appellants, Mr. and Mrs. Richard Hrebec, are insureds under a group medical insurance policy issued by defendant Aetna Life Insurance Company. In a jury waived trial, the trial court ordered Aetna to pay the Hrebecs $13,410.73 for certain medical expenses but denied their claims for other items of expense amounting to approximately $30,000. The Hrebecs appeal the denial of the balance of their claims. We affirm in part and reverse in part, remanding for a determination of the amount of expense recoverable under the terms of this opinion.

In September, 1973, Mrs. Hrebec suffered a massive stroke. A craniotomy was performed at Firmin Desloge Hospital in St. Louis where she was confined until February, 1974. Since the operation she has remained in essentially a comatose state, paralyzed and completely helpless–a condition from which she is unlikely to recover.

Mrs. Hrebec was transferred in February, 1974 from Firmin Desloge Hospital to the Extended Care Facility at St. Louis County Hospital under the care of Dr. Wolfgang Schuessler. Dr. Schuessler testified that her condition appeared to improve until January, 1975–her temperature stabilized and a urinary tract infection healed. In April, 1975 Dr. Schuessler determined that continued treatment would not improve her condition. She was then transferred to St. Sophia Geriatric Center in Florissant, where she now is. As mentioned, there is no reasonable likelihood of her recovery or improvement. She continues to be fed via nasal tubes and has a catheter in place. She must be turned periodically to avoid decubitis ulcers and is bathed and clothed by the nursing staff at St. Sophia. She is also given prescribed medication, receives physical therapy and is visited by a staff physician at least monthly.

The items of expense forming the cynosure of this appeal are those incurred by the Hrebecs at St. Sophia. Aetna agrees that it is responsible for physicians' fees and medical supplies and medicines. But it contends that within the terms of the policy, St. Sophia is not a hospital and that Mrs. Hrebec is receiving "custodial care"; that the cost of such care at St. Sophia is excluded under the policy.

The relevant portions of the insurance policy are as follows:

In Article I, Section 1–General Definitions, "hospital" is defined:

(f) The term "hospital" means only an institution which meets fully every one of the following tests, namely, (a) it is primarily engaged in providing–for compensation from its patients and on an inpatient basis–diagnostic and therapeutic facilities for the surgical and medical diagnosis, treatment, and care of injured and sick persons by or under the supervision of a staff of physicians, and (b) it continuously provides twenty–four hour a day nursing service by registered graduate nurses, and (c) it is not, other than incidentally, a place for rest, a place for the aged, a place for drug addicts, a place for alcoholics, or a nursing home.

In Article II "covered medical expenses" are defined:

Covered Medical Expenses are the reasonable charges which an employee is required to pay for the following services and supplies received by a covered family member for the necessary treatment of any non–occupational injury or non–occupational disease:

HOSPITAL BOARD AND ROOM EXPENSES: These are the charges made by a hospital, in its own behalf, for board and room. However, if private accommodations are used, any excess of daily board and room charges over the applicable Private Room Limit will be disregarded.

OTHER MEDICAL EXPENSES: The following charges are considered "Other Medical Expenses", provided that they have not been considered as "Hospital Board and Room Expenses":

(1) The charges made by a hospital, in its own behalf, for necessary hospital services and supplies, other than board and room;

(2) The fees of a physician or surgeon;

(3) The charges of a registered graduate nurse–other than a nurse who ordinarily resides in the employee's home, or is a member of the family of either the employee or the employee's spouse;

(4) The charges for the following medical services and supplies:

(i) Drugs and medicines obtainable only upon a physician's prescription;

(ii) Diagnostic x–ray and laboratory examinations;

(iii) X–Ray, radium, and radioactive isotopes therapy;

(iv) Anesthesia and oxygen; . . .

The following exclusion appears under "Exclusions, Limitations, and Provisions Applicable to All Titles Under Article II":

No insurance is afforded under any title of Article II as to charges for custodial care; and before determining benefits under any Title, the amount of any such charges shall be deducted from the family member's expenses which are covered under such Title and from his Allowable Expenses (as hereinafter defined).

Article I, Section 1–General Definitions defines "custodial care" as follows:

(s) The term "custodial care" means care comprised of services and supplies, including room and board and other institutional services, which are provided to an individual, whether disabled or not, primarily to assist him in the activities of daily living. Such services and supplies are custodial care without regard to the practitioner or provider by whom or by which they are prescribed, recommended or performed.

Room and board and skilled nursing services, when provided to an individual in a hospital or other institution, for which coverage is specifically provided under a Title of Article II, shall not be custodial care when such services must be combined with other necessary therapeutic services and supplies in accordance with generally accepted medical standards to establish a program of medical treatment which can reasonably be expected to contribute substantially to the improvement of the individual's medical condition.

While Mrs. Hrebec was a patient at Firmin Desloge, Aetna paid full benefits under the policy, totalling about $30,000. Aetna did not receive the first billing from St. Louis County Hospital until December, 1974, and at that time, its medical consultants determined that care after July, 1974 at St. Louis County's Extended Care Facility was "custodial" in nature. Therefore, Aetna's position was that it was not liable for custodial care expenses after that date except for certain drug and miscellaneous items to which the "custodial care" exclusion did not apply. At trial, after Dr. Schuessler testified that Mrs. Hrebec showed improvement through December, 1974, Aetna agreed to pay the St. Louis County treatment expense through that date. Additionally, the trial judge found that Aetna owed the Hrebecs for the remainder of Mrs. Hrebec's stay at County Hospital because of certain representations made to Mr. Hrebec. Aetna did not appeal this finding. Payments under the policy to date total about $50,000, with the policy having an aggregate limit of $250,000.

The trial court determined that the evidence clearly showed that St. Sophia Geriatric Center is a nursing home and not a hospital as defined in the policy. Therefore, room and board charges at St. Sophia were not a "Covered Medical Expense" within the "Hospital Room and Board" category. The court also found that the list of charges that were considered "Other Medical Expenses" was exclusive, and, because this list did not mention room and board charges at a nursing home, St. Sophia's fee was not an expense covered by the policy.

Moreover, the court resolved that the care that Mrs. Hrebec receives at St. Sophia is "custodial care" as that term is defined in the policy and is specifically excluded from coverage in any event.

We are presented with the following questions for review: (1) whether Aetna waived its policy defenses of exclusion of "custodial care" and "nursing home" charges by not asserting them at the earliest available time and because of in–court admissions; (2) whether the listing of medical services in the policy under the heading "Other Medical Expenses" is an exclusive description of the expenses covered by that section; (3) whether the trial court properly construed the term "custodial care" as used in the policy, and if Aetna satisfied its burden of demonstrating that Mrs. Hrebec was in fact receiving "custodial care".

The substance of Aetna's defense is that St. Sophia is not a "hospital". Thus, it is not covered under the hospital expenses provision. It also maintains that the care received at St. Sophia is "custodial" and falls within the "custodial care" exclusion.

■ Contrary to the Hrebec's contention, the evidence supports the trial court's conclusion that Aetna was timely in asserting its defenses. Mr. Hrebec was advised of the custodial care exclusion and that room and board at a nursing home were not covered expenses prior to placing Mrs. Hrebec in St. Sophia. It declared the defenses at the time the St. Sophia claims were denied and affirmed them in its answer to plaintiffs' petition. Therefore, we are not confronted with the instance of denial of coverage on a stated ground and a later, different assertion of liability disclaimer. *See Hounihan v. Farm Bureau Mutual Ins. Co. of Mo.*, 523 S.W.2d 173 (Mo.App.1975).

■ Nor can we find any waiver of Aetna's denial of liability for St. Sophia expenses by its agreement to pay for the St. Louis County Extended Care Facility treatment subsequent to Dr. Schuessler's testimony that Mrs. Hrebec showed improvement through December 1974. It has been Aetna's position that the County care had

been custodial from July 1, 1974. The agreement to continue payments through December was only a modification of the "custodial care" date.

■ Any failure on the part of Aetna to assert that the Extended Care Facility of the St. Louis County Hospital was not within the policy definition of "hospital" cannot be reasonably construed to flow to St. Sophia Geriatric Center, although St. Sophia and the Extended Care Facility are licensed similarly as "skilled nursing" institutions. It is manifest from the record that the St. Sophia services area is well within the "custodial care" policy definition and well without the "hospital" definition. *See McManus v. Equitable Life Assurance Society*, 583 S.W.2d 271 (Mo.App.1979). *See also, e. g., Waak v. National Bankers Life Ins. Co.*, 180 Neb. 129, 141 N.W.2d 454 (1966) (insurance coverage for convalescent "annex" of a hospital despite policy exclusion for nursing and convalescent homes). *But see: Zimmerman v. National Home Life Assurance Co.*, 517 S.W.2d 842 (Tex.Civ.App.1974) (extended care "skilled nursing facility" not covered though part of a complex including a hospital). While the Extended Care Facility is part of a hospital complex, St. Sophia is not, nor is it a hospital. *McManus v. Equitable Life Assurance Society*, 583 S.W.2d at 272–73. Under the circumstances, it would be reasonable for Aetna to waive the hospital defense for the County's Extended Care Facility yet not do so with regard to St. Sophia.

The Hrebecs' second point on appeal urges that the trial court too narrowly interpreted the "Other Medical Expenses" provision of the policy. The trial court determined that the four specific categories of medical services listed under "Other Medical Services" comprised a complete and exclusive description of the services covered by that provision. The Hrebecs, however, focus on the word "considered" in the clause "The following charges are considered 'Other Medical Expenses' . . ." and contend that this indicates that the services listed are merely examples of the kinds of medical services covered by the policy.

In interpreting the provisions of an insurance policy, there are certain established rules of construction we must apply. First, the interpretation of the unambiguous terms of an insurance policy is a question of law, and, as such, we are not required to defer to the findings of the trial court. And as with any other contract, we must reasonably construe the policy consonant with the apparent objective and intent of the parties. *State Farm Mut. Auto. Ins. Co. v. Thomas*, 549 S.W.2d 616 (Mo.App. 1977). Additionally, where the policy provision is clear and unambiguous, it is the court's obligation to enforce the policy as written, even though it may appear to operate harshly or inequitably as to one of the parties. *Moskowitz v. Equitable Life Assurance Society*, 544 S.W.2d 13 (Mo. banc 1976).

Plaintiffs' contention that the "Other Medical Expenses" clause merely lists examples of covered expenses is not a reasonable construction of the policy. In context, the word "considered" appears to be used synonymously with "deemed". The four enumerated categories describe what is covered; it is not necessary to state further what is not covered under that provision. "When one states that an apple is red, he need not add that it is not green, brown, blue or any other color besides red." *Moskowitz v. Equitable Life Assurance Society*, 544 S.W.2d at 16.

This interpretation is bolstered by the existence of a "Special Conditions" section, immediately following the definition of "Other Medical Expenses", which lists items that the policy will cover, although they would not fit into any of the categories previously listed under "Other Medical Expenses". This supports the view that "Other Medical Expenses" gives an exclusive listing of benefits—the "Special Conditions" being the only exceptions to that exclusivity. Accordingly, room and board expense at St. Sophia is not a "Covered Medical Expense", because St. Sophia is not a hospital. *A fortiori*, it is not covered under "Hospital Room and Board Expenses". Nor are room and board at a nursing facility within any of the listed categories under "Other Medical Expenses"; neither are they mentioned in the "Special Conditions".

The final point we must consider is whether the trial court correctly interpreted the term "custodial care" and whether Aetna satisfied its burden of proof of demonstrating that Mrs. Hrebec has been receiving "custodial care" during her stay at St. Sophia. The policy provides a blanket exclusion of benefits for otherwise covered expenses if the insured is receiving merely "custodial care" as defined in the policy (policy definition set out above). Although we have already determined that plaintiffs are not entitled to reimbursement for room and board expense at St. Sophia, coverage for other expenses may still be at stake. For example, paragraph (3) under "Other Medical Expenses" states that the "charges of a registered graduate nurse" are covered, without any requirement that the nurse's services be performed in a hospital or any other specific location. Therefore, as long as the services were not rendered for "custodial care", the charges of a registered nurse for services performed at St. Sophia, or elsewhere, would be compensable under the policy.

The basic facts concerning Mrs. Hrebec's care and condition are not in dispute; therefore, whether Mrs. Hrebec has been receiving "custodial care" or not is a question of law for our determination. *McManus v. Equitable Life Assurance Society*, 583 S.W.2d at 273. Ambiguities in an insurance contract are to be resolved in favor of the insured, especially when dealing with exclusions from coverage. *Kyte v. Fireman's Fund American Ins. Cos.*, 549 S.W.2d 366, 368 (Mo.App.1977); *Kay v. Metropolitan Life Ins. Co.*, 548 S.W.2d 629, 631 (Mo. App.1977). Ordinarily, if a term is defined in the policy, we look there and nowhere else for the definition, for the definition is a part of the contract. *McManus v. Equitable Life Assurance Society*, 583 S.W.2d at 272. However, the definition itself must be clear and unambiguous or else we again are free to give a reasonable construction to the term, applying general contract principles,

with doubts resolved in favor of the insured.

■ There are two paragraphs in the policy that attempt to define "custodial care". The first one basically provides that " 'custodial care' means care . . . primarily to assist [the insured] in the activities of daily living. . . ." The purpose of this paragraph appears to be to define what custodial care *is*. The second paragraph's purpose is not quite as clear. It states in pertinent part: "Room and board and skilled nursing services . . . shall not be custodial care when such services must be combined with other necessary therapeutic services and supplies . . . to establish a program of medical treatment which can reasonably be expected to contribute substantially to the improvement of the individual's medical condition." This paragraph's purpose may be reasonably viewed as either to clarify what is and is not "custodial care", or to exempt from the exclusion certain services which are custodial care" as defined by the first paragraph.

In its brief, Aetna takes a somewhat oracular view of the role of this second paragraph. At one point, it asserts that custodial care "is care that is not expected to bring about medical or physical improvement of the patient's condition"–the second paragraph here being used to clarify what constitutes "custodial care". But Aetna also refers to the second paragraph as an "exception" to the custodial care exclusion, quoting the first paragraph as the definition of "custodial care" and then stating that the "only exception is when the 'treatment can be reasonably expected to contribute substantially to the improvement of the individual's medical condition' ".

Because of the uncertainty, we choose to view the second paragraph as an exception (the interpretation favorable to the insured), so that the care in question first must be found to be "custodial", under the definition in the first paragraph, and then the terms of the second paragraph come into play to determine if this "custodial care" is excepted from the exclusion from coverage.

"Custodial care" is defined in the policy as care that is primarily intended to assist in the "activities of daily living". However, the phrase "activities of daily living" is open to varying reasonable interpretations and gives little substance to the term "custodial care". Therefore, we resort to extrinsic sources to search for a reasonable interpretation of "custodial care", while affording the insureds the benefit of any ambiguity.

Neither brief on appeal cites any cases dealing with "custodial care". Our research has uncovered a number of federal cases which construe "custodial care" as used in the Social Security Act (SSA). While we recognize that we are dealing with a private insurance policy, not the SSA, and that we are not bound by those interpretations of federal law, they do illustrate a reasonable approach to the construction of the term.

As in the Hrebecs' policy with Aetna, the SSA provides for an exclusion from coverage for "custodial care". 42 U.S.C.A. § 1395y(a)(9). But the SSA does not attempt any further definition of the term. Hence, the courts have taken a common–sense approach and generally agree that "custodial care" connotes "a level of routine maintenance or supportive care which need not be provided in an institutional setting by skilled professional personnel." *Hayner v. Weinberger*, 382 F.Supp. 762, 766 (E.D.N.Y.1974); *accord Ridgley v. Secretary of HEW*, 475 F.2d 1222, 1223 n.3 (4th Cir. 1973); *Rendzio v. Secretary of HEW*, 403 F.Supp. 917, 920 (E.D.Mich.1975); *Sokoloff v. Richardson*, 383 F.Supp. 234, 237 (E.D.N.Y.1973). Additionally, "custodial care" has been characterized as: "[C]are designed essentially to assist an individual to meet the activities of daily living. Such activities include assistance in bathing, feeding, and supervision of medication which can usually be self–administered. These services do not require the continuing attention of trained medical or paramedical personnel." *Whitman v. Weinberger*, 382 F.Supp. 256, 260 (E.D.Va.1974).

In *Sokoloff*, the plaintiff was 75 years old, and was placed in the nursing home because she lived alone and was "suffering from the afflictions of old age, including senility." 383 F.Supp. at 238. The care provided her was determined to be merely custodial because there was no evidence of the rendering of any services which might be viewed as skilled. The nurses' duties essentially comprised "supervision of plaintiff due to her confused and disoriented condition." *Id.*

*Westgard v. Weinberger*, 391 F.Supp. 1011 (D.N.D.1975), reported this view of "custodial care":

> It is care that could be administered by any layman, without any possible harm to the health of the one in custody. . . This view of "custodial care" is also in agreement with the definition of "custodial" as found in Webster's Third New International Dictionary (1967 ed.) i. e., "related to or marked by guardianship or maintaining safely." Thus mere "custodial care" refers quite simply to guardianship for convenience that has no significant relation to medical care of any type.

*Id.* at 1019–20 (emphasis omitted) (quoting *Samuels v. Weinberger*, 379 F.Supp. 120, 123 (S.D.Ohio 1973)). The court found that the claimant's physical therapy entailed the attention of skilled medical personnel and ordered that benefits be paid. *Id.*

A case with some factual similarities to the one *sub judice* is *Hayner v. Weinberger* allowing recovery of benefits for a terminal cancer patient. In *Hayner*, after determining that there was little hope for recovery of his 83 year old patient, the treating physician recommended that Mrs. Hayner be transferred to an extended care facility. She required the weekly change and daily irrigation of a Foley catheter, which called for "skilled professional care" and received daily visits from a doctor. The court held that more than mere "custodial care" was received. *Cf. Coe v. Secretary of HEW*, 502 F.2d 1337 (4th Cir. 1974) (certain aspects of treatment in nursing home required skilled care).

■ Mrs. Hrebec's continued helpless condition necessitates that she be fed through nasal tubes and that an indwelling catheter be in place. Aetna has not argued that such equipment does not require the attention of trained and skilled medical personnel. The available evidence indicates that the servicing of nasal feeding tubes and catheters qualifies as "skilled nursing services". In fact, the federal regulations applicable to the SSA specifically list those services as skilled. 42 C.F.R. § 405.-127(c)(2)(ii), (iv). In any event, Aetna did not adduce any evidence to the effect that such services could have been carried out by a lay person *after initial explanation by a* medical professional. *See Rendzio v. Secretary of HEW*, 403 F.Supp. at 920.

An error of law occurred when the "custodial care" exclusion was interpreted to preclude recovery for any of the expenses at St. Sophia. We hold instead that the Hrebecs are entitled to recover the expenses of any treatment by trained and skilled medical personnel which must be provided in an institutional setting–provided it is an expense that is listed in the four categories of "Other Medical Expenses". Specifically listed are physician's fees and the charges of a registered graduate nurse. Because St. Sophia's invoices did not reflect an itemized charge for the services of a registered nurse, it is impossible to determine what amount plaintiffs are entitled to recover. Thus, we remand to the trial court for additional findings of fact on the registered nurse cost item.

■ Our inquiry cannot end there, however.[1] Mrs. Hrebec is receiving many different services, and some of them are clearly "custodial", not requiring the attention

---

1. If the particular facts of this case should arise under the SSA, however, the analysis might indeed end there. The previously cited cases indicate that the federal courts probably would not label Mrs. Hrebec's total care plan as "custodial" in nature. And under the SSA's remedially broad interpretation, her total expenses, including those for incidental services which are purely custodial in nature (such as bathing or changing her position in bed periodically), could conceivably be covered. *See Sokoloff v. Richardson*, 383 F.Supp. at 237.

of a skilled professional in an institutional environment. The policy exclusion for "custodial care" (see above) and the second paragraph of the definition of "custodial care" indicate that services which are primarily custodial are not reimbursable merely because they are rendered in conjunction with other covered services. The exception formulated in paragraph two states that coincidental custodial services will be covered only "when such services must be combined with other necessary therapeutic services and supplies . . . to establish a program of medical treatment which can reasonably be expected to contribute substantially to the improvement of the individual's medical condition." Therefore, we must decide whether or not Mrs. Hrebec is under a program of medical treatment expected to improve her medical condition.

The trial court determined that because all the medical testimony clearly indicated that there was no reasonable hope for Mrs. Hrebec's recovery, she was not under a program of treatment to improve her medical condition. The Hrebecs, however, submit that this policy provision is ambiguous and should be construed against the insurer. They argue that "improvement of medical condition" does not necessarily mean an improvement towards the eventual cure of the patient; they urge that it can mean an improvement over what the individual's condition would be if she had not received the treatment. They syllogize that as the evidence indicated Mrs. Hrebec would die without the care she has been receiving, her current comatose state is an improvement over what her condition would be without such care.

The latter is an unreasonable interpretation of the policy. This is a policy which requires an "injury" or "disease" to trigger coverage. The triggering injury or disease, in this case was the rupture of a cerebral aneurysm resulting in brain damage. The policy, when it mentions "medical condition" in this context, clearly refers to the

benefit–triggering injury or disease. The evidence shows that Mrs. Hrebec's doctors have given up all hope for her recovery. Her "medical condition", the brain damage, is not being administered to; she merely is being kept alive. Therefore, the Hrebecs may not recover for purely custodial expenses which may be required in conjunction with the maintenance of Mrs. Hrebec's life, at least so long as her underlying medical condition remains untreatable.

The judgment for plaintiffs in the amount of $13,410.73 is affirmed. The denial of recovery for nurses' services requiring trained and skilled medical care is reversed; the cause is remanded for further findings of fact in that regard.[2]

Judgment affirmed in part and reversed and remanded in part.

SNYDER and PUDLOWSKI, JJ., concur.

---

**2.** Aetna does not deny its liability under the policy for the cost of physicians' services and medical services and supplies referred to in the

policy. It has and will continue to make payment for those expenses.